# IN THE COURT OF APPEALS OF IOWA

———————————————

No. 25-1915
Filed July 22, 2026

———————————————

**Jesse Andrew Moser,**
Plaintiff–Appellee,
v.
**Megan Lee Moyle,**
Defendant–Appellant.

———————————————

Appeal from the Iowa District Court for Clayton County,
The Honorable Alan Heavens, Judge.

———————————————

**AFFIRMED**

———————————————

Justin D. Riem of Arenson Hofmeyer, P.C., Cedar Rapids, attorney for
appellant.

Taryn R. McCarthy of Clemens, Walters, Conlon, Runde & Hiatt, L.L.P.,
Dubuque, attorney for appellee.

———————————————

Considered without oral argument
by Schumacher, P.J., Ahlers, J., and Bower, S.J.
Opinion by Bower, S.J.

1

**BOWER, Senior Judge.**

Megan Moyle appeals the district court order finding she and Jesse Moser should have shared physical care of their child. Finding shared physical care is in the child's best interests, we affirm.

## I. Background Facts and Proceedings

Megan and Jesse began dating in October 2018. They soon began living together, and in January 2021, their child was born. During Megan's pregnancy, Jesse attended some of her prenatal appointments, helped prepare the apartment, and was present at the child's birth. About one month later, Megan asked Jesse to move out.

Jesse saw the child for "an hour or two" each week at his parents' house (where he was staying); he did not have items like a crib or diapers for the child. According to Jesse, he asked Megan for more time with the child, which she generally ignored or denied. In the summer of 2022, after Jesse obtained his own home with a room for the child, his attorney sent Megan a letter requesting more visitation, starting with alternating weekends of Friday to Sunday evening with the child. Megan claims Jesse had never asked for more time before, but she agreed to the alternating weekend visits. That visitation continued through the custody trial, aside from a single brief attempt at longer visits.

On July 3, 2024, Jesse filed a petition to establish paternity, custody, visitation, and related issues under Iowa Code chapter 600B (2024). He sought "joint legal custody and shared physical care" of the child. Megan agreed to joint legal custody, but she sought physical care of the child, keeping the every-other-weekend visitation with Jesse.

Jesse has a house in Guttenberg, and his girlfriend and her child live with him. He works in the paint department at an Elkader company, with a regular schedule of Monday to Friday, 5:00 a.m. to 2:00 p.m. (ending at noon on Friday). On occasion, he has mandatory overtime requiring him to stay at work an extra two hours at the end of the workday. On some weekends, Jesse performs in a band with his father and cousin; he brings the child along if the venue is appropriate, and his mother watches her and she dances along. He is very close to his family, who generally live nearby.

Megan lives on a farm outside Elkader with her husband and older child; she was expecting another child at the end of the year. Megan has full custody and care of her oldest child and has never coparented with that child's father. She works as a nurse at a Fayette nursing home, working 6:00 a.m. to 6:00 p.m., Tuesday to Thursday. She had recently obtained her real estate license and may eventually switch her career.

Megan has not involved Jesse in any of the decisions for the child—doctor appointments, daycare selection, etc. When she moved to her current home, she did not let Jesse know about the move or her new address. And when Jesse asked if he could adjust pickup/drop off times, due to the often-late-notice of the requests, Megan was generally not flexible. Jesse described Megan as "a very good mom." Megan, on the other hand could not describe Jesse as a person or a parent, stating she "ha[d] not seen him parent" the child. While Megan was not sure when Jesse moved to his house, she would drop off the child there for weekends with Jesse. The child is close to her older sibling at Megan's home and is growing close to the daughter of Jesse's girlfriend.

The child was attending preschool at Elkader's school district, as the parents agreed to before the child's birth. The child rides the bus to and from

school from Megan's house, with Megan's husband getting her ready and supervising the days Megan is at work. Jesse's girlfriend and one of his sisters would help with drop off and pick up of the child from school as needed based on Jesse's work schedule. The little communication between the parents revolves around exchange times to pick up the child and occasional direction or question about the child.

In its order, the district court established Jesse as the child's father and ordered joint legal custody. The court then applied four factors to evaluate shared physical care that are described in *In re Marriage of Hansen*, 733 N.W.2d 683, 697–99 (Iowa 2007). The court found three of the factors favored shared physical care. The court ordered the parents to share physical care of the child and adopted Jesse's waiver of the minimal child support he would receive.

Megan appeals, arguing the court should not have ordered shared physical care of the child and urging she would provide superior care.

## II. Standard of Review

"We review physical-care determinations de novo." *Randall v. Trier*, 15 N.W.3d 809, 813 (Iowa Ct. App. 2024). We review the entire record and adjudicate the issues properly presented anew. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). "While we are not bound by the fact-findings of the district court, we give them weight, especially as to credibility determinations." *Thorpe v. Hostetler*, 949 N.W.2d 1, 5 (Iowa Ct. App. 2020).

## III. Physical Care

Iowa Code chapter 600B (2025) governs cases of paternity, custody, visitation, and support between unmarried parties. *Montgomery v. Wells*, 708 N.W.2d 704, 707 (Iowa Ct. App. 2005). "[S]ection 600B.40 grants the

district court authority to determine matters of custody and visitation as it would under Iowa Code section 598.41." *Id.* "The criteria governing custody decisions are the same regardless of whether the parties are dissolving their marriage or are unwed." *Id.* (citation omitted).

The objective of a physical care determination "is to place the child[] in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695. For the court to deny a parent's request for shared physical care, it must make "specific findings of fact and conclusions of law that the awarding of joint physical care is not in the best interest of the child." Iowa Code § 598.41(5)(a); *Hensch v. Mysak*, 902 N.W.2d 822, 825 (Iowa Ct. App. 2017).

We consider several factors when determining whether shared physical care is in the child's best interests, including: "historic patterns of caregiving," the ability of the parents "to communicate and show mutual respect," "the degree of conflict between parents," and the "general agreement about their approach to daily matters." *Hansen*, 733 N.W.2d at 697–99.

*Caregiving.* For historic caregiving, it is undisputed Megan took the lead since the child's birth. But at least some of that was because Megan imposed limits on the time Jesse spent with the child and made no effort to include him, combined with Jesse's failure to clearly articulate a desire for more time on a regular basis or more involvement. At one point, they tried an extended visitation period, but Megan did not like it because "it wasn't a consistent routine" and hard on the child, so they reverted to alternating weekends against Jesse's wishes. This factor does weigh in Megan's favor and away from shared physical care.

*Communication.* Communication between the parents appears to be minimal but generally unobjectionable. To weigh against shared physical care, "the communication difficulties and tension must rise above the not atypical acrimony that accompanies litigation in family-law matters." *Hensch*, 902 N.W.2d at 826 (citation omitted). Megan says Jesse makes her uncomfortable, so their communication is largely about visitation, with neither party messaging the other when the child is in their care. She said she answers when he asks questions, but she does not provide much information beyond that. Both agreed more communication would be necessary for shared care to be successful for the child. It seems no information was requested or offered about the child's general health or medical care, though they did generally agree on vaccinations for the child. For example. Megan did not inform Jesse when the child had Covid—he found out from Megan's father; at most, she has sent instructions for medication the child is taking during visit weekends. But Jesse has not asked about the child's doctor or for insurance information. In short, while more consistent communication about what is going on in the child's life would be better, including more active requests for information by Jesse, these parents have found a balance that works for them. This factor weighs in favor of shared care.

*Conflict.* Jesse and Megan agree there is not much conflict between them aside from scheduling issues. Megan suggested if there were she would talk to Jesse more and approach him with coparenting goals. But the parents are civil to each other and communicate without hostility. The only "hostile" words offered at trial were Jesse telling the child they had to hurry to make the drop off time because Megan was mad. Again, this factor weighs in favor of shared physical care.

*Daily matters.* At Megan's house, the child plays outdoors often, and the family eats home-cooked meals. The child takes the bus to preschool and back home, playing outside until dinner. The days Megan works, her husband sends the child to school on the bus and supervises after the child is home. Jesse's weekends include getting up, watching a little tv, making meals, and doing different activities in the afternoon, sometimes including playing golf or performing with his band. But he conceded with weekday custody, he would also be relying on family to get the child to school on time.

*Other.* Megan's primary argument during her testimony against shared physical care of the child was that she "d[id]n't want to separate [her] kids." She said her older child has been in the child's life more than Jesse has, and separation "would be really hard on them." Megan also thought the change in routine would be hard on the child. Megan seemed unsure how Jesse would handle schooldays getting the child ready, and she did not like disrupting the child's routine. But she admitted that although she didn't think shared care was best for the child, it could be "workable." While the child's relationships with siblings are important, we do not think they tilt the balance away from shared physical care.

Both parents clearly love the child and wish to maximize the time they can spend with her. Both are supported by family and friends in the area. Upon our de novo review of the evidence, we agree with the district court that shared physical care is in the best interests of this child. We affirm the court's order for shared physical care.

## IV. Appellate Attorney Fees

Last, Megan and Jesse each request appellate attorney fees. Appellate attorney fees are not a matter of right but may be awarded as a matter of discretion." *Hensch*, 902 N.W.2d at 827. And by statute, the court's award of

attorney fees is limited to the prevailing party. Iowa Code § 600B.26. "In determining whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal." *Hensch*, 902 N.W.2d at 827. Based on these factors, we decline to award appellate attorney fees to either party.

**AFFIRMED.**